Good morning, Your Honors. I'm Antonio Rossman, and with me is David Moore from Rossman & Moore. We're representing the Mendocino County Parties. One set of petitioners in this proceeding, those who are the lawful users of water from the Eel and Russian Rivers in the upper Russian River Valley. We would like to reserve three minutes of the 15 minutes that the Court has allotted to us for reply. Our case is founded in the failure of FERC to meet three important duties. First, to protect those who have relied on the lawful license for diversion of water from the Eel to the Russian River. That includes the family farms in the upper Russian River. It includes the city of Ukiah and other towns, who for nearly a century have built a dynamic and commendable economy based on that license. Secondly, FERC has unfortunately abdicated its own authority and responsibility under the Federal Power Act. And ironically, FERC has also failed its duty to the species that are at issue here. The starting point in this case has to be the statute, Section 7 and its implementing regulations. And the action words are that each Federal agency, in consultation with NIMFS under Section 7, must ensure that its agency action does not jeopardize endangered species. The regulation reads, the Federal agency shall determine that its action does not jeopardize. And in the Federal Register notice that accompanied the adoption of that regulation, NIMFS and the Secretary of Interior make clear the service recognizes that the Federal agency has the primary responsibility for implementing the substantive command of Section 7. And the point you're trying to make is? That in this case, FERC abdicated its authority and duty to decide for itself what was the best regime in making its Article 39 reconsideration of Article 38. Kennedy, does that abdication violate the law whether the National Marine Fishery Service was arbitrary and capricious or not? Or is it only violative, in your opinion, if the National Marine Fishery Service was arbitrary and capricious in choosing the baseline? Your Honor, in our view, FERC's arbitrariness and capriciousness is what is technically before the Court, and I think the best answer I can give is that it was arbitrary and capricious for FERC to accept the determination of NIMFS that was based on a faulty project definition and faulty assumption, that it is under Section 7. So you're saying that the mistake is not that they said to NIMFS, what do you think, and then did what NIMFS wanted instead of what their initial inclination was. The mistake was in saying, what do you think, and then doing what NIMFS wanted, even though what NIMFS wanted made no sense, was arbitrary. That is correct, Your Honor. Because within the rule for you, for your position, that said it has to be that they are deferring to. It is. They have discretion to defer to NIMFS on matters where NIMFS has expertise. Let me make my question clear. I don't think I did. Sure. I'm trying to find out just how much you're asking for. Yes, sir. And I want to know, are you asking for a rule that says FERC has to make an entirely independent decision and can't defer to NIMFS no matter what, or are you only saying FERC's has to suspend its deference when NIMFS makes an arbitrary and capricious decision? It is the latter, Your Honor, and that is because under the Federal Power Act and the Endangered Species Act, which have to be read together, Congress, even under the ESA, entrusted project definition to the action agency. It is FERC who said this is an amendment of a final license. And NIMFS's entire ---- It's not all that complicated. Alcoa says one agency can defer to another so long as the deference is reasonable. And your argument here is it wasn't reasonable because they didn't know what they were doing. They made a mistake. Yes, sir. And that is not a reasonable deference. In fact, as we just ---- You got your point. Thank you, sir. I will not belabor that point any further. The point is that not only was the project misdefined, but the baseline was misdefined. And that is crucial. Here is FERC in its two decisions, in both its basic order and in its rehearing, with incredible internal instances. If you could just indicate me on this baseline. Yes, sir. If I understood it right, the baseline that NIMFS uses is if there was no dam. That's correct. All right. But there is a dam, right? There is a dam. It was ---- Well, actually, it was a little bit more refined than that, if that's the right ironic word to use. What I'm asking is, is the baseline here like the Garden of Eden? Is the baseline like if we tear down the dam? The reason I ask it is if we tore down the dam, we'd fill the stream with rubble and mess. It wouldn't be like the Garden of Eden. No, sir. In fact, the baseline that FERC used was a baseline that does not exist. It is the run of the river with the projects in place. That's the way NIMFS tried to avoid the implication that I think ---- What does that mean? I'm not sure what that means, to say that there is a baseline that consists of the river running with the dams in place. But what FERC properly understood the baseline ---- The baseline is what it is now. The baseline is running and the dams are in place. I don't understand what the words mean. But the baseline is also the operation of the dams under Article 38, which is a part of the final 1983 license. That is the baseline, and that was for FERC to determine what that baseline. It is the baseline that this Court in the American Rivers case validated. And in response to our complaint and the complaint of others, including the California Department of Fish and Game, that, hey, you're basing this on NIMFS's Well, each agency can use its own baseline. And the problem with that is that FERC is the action agency and has to make a decision. And it has to know on what basis it makes that decision. And for purposes of NEPA, it has to write its environmental impact statement on a stable baseline. And then ---- Article 39 gives FERC discretion to modify the Article 38 flow regime. That's right. And that is the action in this case, the consideration of whether and how to exercise that discretion. But one of the options open to FERC would have been no action. And the environmental impact statement probably properly included that. And no action would have meant that the Article 38 flows, which everyone concedes, are far inferior to FERC's preferred alternative of the Potter Valley Irrigation District alternative. Everyone concedes that Article 38 would be the worst possible outcome for the fish. And yet, FERC does have that discretion to do that. And if FERC had followed that course, there would have been no Section 7 consultation. There would have been no federal action. But that's not what FERC did. FERC used the information that it gathered. It built a consensus with NIMFS originally, with Department of Fish and Game, with PG&E, everything that we talk about in the law schools that people ought to be doing in the resources area, was done in this case. And then NIMFS pulled out of that consensus because it wanted to pretend that the project was de facto relicensing and that the baseline was some, if you will, semi-Garden of Eden rather than what was in place, lawfully permitted in 1983 so that the Mendocino County water users knew for a period of time up until year 2022 that their investments would be protected. And so that the licensee itself, PG&E, and yes, this is almost a 100-year-old dam, but that's part of the problem. It takes a lot of money to maintain a 100-year-old dam. And PG&E needs to have some security as the Federal Power Act grants it, that this is not going to be up for perpetual reconsideration. And that, yes, in the year 2022, when relicensing comes up, some hard questions are going to have to be asked. But those questions are premature. And what we are seeing from NIMFS here and from the nonprofit private co-Petitioners in this case is an effort to accelerate that deconsideration. I ---- Roberts. Let me switch gears just a second. Yes, sir. What's your position on the fishways at Scott Dam? It can be considered, but it was up, you know, it's up to FERC to reject that. I mean, we feel that under NEPA, one has to look at all alternatives. Whether they are feasible alternatives, it is the obligation and the prerogative of the agency in the first instance to reject an alternative that's not feasible. The condition is they didn't consider fishways at all. We do not take a position on that in our case. I think some of the other Petitioners take issue with that. But we did not intervene in the other cases, Your Honor. So as much as we might want to say something about that, I feel that's not our place. Our concern is that FERC properly understood what it was doing, properly defined a baseline, and then just totally abdicated that based on the irrationality of NIMS pretending that it was their project. In an ideal world, perhaps, the Secretary of Interior would have to grant approvals for projects like this. But that was not the congressional design. Congress recognized that there are a host of federal actions that a host of federal agencies make in our country day in and day out. And that each of those have to be measured by not throwing out generations of legislation that defines the rules under which FERC licenses hydro facilities under which the NRC may deal with nuclear facilities and the like. And it is that, if you will, destruction of the congressional design that really is at issue here. I would like to just briefly also touch on the question of the failure to articulate and identify the impacts that would flow from not recognizing and protecting California water rights. I think we've adequately briefed that. But you see, it shows that, if you will, Your Honors, the connectivity of our case, because if one doesn't start with a proper baseline, then which recognizes the existence and exercise of those rights, one cannot rationally determine what the impacts would be from failing to protect those rights. And in the end, I mean, it was even clear before the final action, but FERC's coming out with this statement that, well, with respect to baselines, whatever. And that just totally vitiates any rational environmental assessment. What are you pointing at in the excerpt? Your Honor, in the final, in its final petition for rehearing. Give me an excerpt page number. Yes, sir. I'll give you that right now. Page 2529. Thanks. That the Commission's current conditions baseline has been affirmed on judicial review does not mean that other agencies cannot validly use a different baseline. There has to be one baseline here. Your Honors, I will reserve those three minutes and thank the Court very much. Let me make just one point, though, before I leave it in our case in chief, on remedy. The remedy here, in our view, would be for the Court to order the Commission to set aside its decision. That would reinstate Article 38 flows. But the Commission would then be free to immediately order in the Potter Valley Irrigation District alternative, which it recognized as the preferred alternative. Because that was adequately addressed in the environmental impact statement. Good morning, Your Honor. My name is Stephen Volker. I'm attorney for Petitioner's California Sport Fishing Protection Alliance et al. I'm here to explain why we feel this court must reverse FERC's order and declare that the order violates the National Environmental Policy Act primarily because it omits consideration of two vital, feasible, and repeatedly documented alternatives. The first is to consider fishways. Now, if you help me understand that. Yes, Your Honor. The way it looked to me, from the record, was that you had to lift the salmon about 130 feet in elevation. 13, 15-story building. One way is kind of a fish wheel. It would be a sort of fish ferris wheel. Another would be a fish elevator. And another would be a series of terraces so that the fish could jump themselves. Your fishway, is that the third way, the terraces?  It is the more general term, any way that the fish could get up. Has there ever been a fish ferris wheel or elevator 13 stories high that has been used? There are major fish lifts, and I believe they are at approximately that height on the Columbia River. That height? I thought they were shorter. And there are the traditional fish ladders on dams as high as 90 feet. This was documented in the record. There is no study in this case that shows that either alternative, that is a lift or the alternative of a ladder, would not be feasible. Is there any study showing that they are? I'm thinking of fish wheels in the Yukon, and you can watch the fish get sunburned and dry out and die. Can't leave a fish out of water that long. I'm not aware that anyone proposed a fish wheel, Your Honor, and I am familiar with the fish wheels on the Yukon. It's a means of harvesting the fish, as opposed to elevating them over a structure, as far as I'm aware. Have you, has there been any feasibility study to show that this fishway that your clients proposed is feasible? There was expert testimony from three sources that the commission should consider alternatives, structural alternatives, to maintaining the dam in place. Professors Robert Curry and Terry Roloffs testified that decommissioning or fishways should be considered. Dr. Curry testified as to the example of the Carmel River and the 90 foot fish ladder he was familiar with in that case. The National Marine Fishery Service took FERC to task in 1999 and subsequently for FERC's failure to consider a fish ladder as a series of terraces where they could jump, right? That's correct. Now, a 90 foot rise and a 130 feet foot rise, that's half again as big a rise. Do you have enough? Is the rise extended enough, as opposed to being too steep for a fish ladder, do you need to use? There is no engineering study directed to that question. That's an excellent question, and we believe the burden falls on FERC, Your Honor, in this case, to assume responsibility for answering this question. It was raised by a number of experts. I'm asking you if you're saying that they have a duty to consider something that's never been done and there's no indication that it ever could be done successfully. That's what I want to know. Are we asking for something that doesn't make sense? Perhaps that hypothetical, no. But in this case, fishways are present on 9.5 percent of all of FERC's hydropower facilities, and there are fish lifts that can transport fish the requisite 130 vertical feet. How do they work? They allow water to come in, along with the fish. They're located where the salmon are most likely to be located, and then they're transported up, somewhat like an elevator. So it's an elevator that's full of water? This is correct, Your Honor. I read an interesting article about a seal that now occupies one of those elevators. It eats all the salmon, and they can't get the seal out of there. Evolution, Your Honor. But our point, Your Honor, is that the burden certainly falls on the expert agency, FERC, since we had a broad panoply of fisheries biologists and siting engineering studies, and NMFS itself entreating FERC to take this next step, and it simply didn't happen. It should not fall to the private Petitioners who lack the funds or are not supported by the taxpayers to conduct such a study. With respect to whether it's feasible, I suspect it is, Your Honor. This is 12 miles. I don't know if it is. I mean, there are some things. They sure ought to study things that are feasible, but ask them to study, I don't know, a space elevator, a cannon to shoot the fish? It would be silly, so we wouldn't require them to do it. That's correct, Your Honor. By the way, may I just point out, I have to split my time with the co-Petitioner, and I should have announced that at the outset. And I also wish to reserve two minutes. I've got one more question on my mind. I don't know which of you is going to deal with it. I don't understand the baseline. I don't understand what the river flow with the dam in place means. There are a number of definitions of baseline, depending on models, that predict how the natural hydrograph would appear in the absence of the dam. But the dam is there. If you tore down the dam, the river would be full of rubble. Actually, that's true to a point. Dr. Curry testified that there is a way to, in a measured, stepwise fashion, lower the dam in a manner that would permit strengthening of the stream banks above it so that you wouldn't have the catastrophic flow-through of the accumulated sediment. That's an excellent point. No one is suggesting something that's feasible. I'm not saying nuke the dam, but I mean even removing the dam. No. It's going to have a tremendous impact on the habitat. That's absolutely correct, Your Honor. In our case, the situation is complicated by the fact that we have many years of accumulated debris, both upstream and downstream of the dam, in the river that has to be assessed. I think you're saying the baseline is not anything real, but a model of what the stream would be like if the dam wasn't there. Is that right? That's correct, Your Honor. Okay. I'm sorry. An impaired river flow. Yes, Your Honor. May I continue? Yes. I'm not quite clear where we are on the time. Is this the total time left for the petitioners? Yes. So I have eight and a half minutes, and if I'm reserving two, I should excuse myself because we had 15 total. Thank you. Good morning. Ellison Folk on behalf of petitioners, Friends of the Eel River. And I'm going to focus primarily on the Endangered Species Act claims that are raised in our briefing, and I'd like to reserve, if I might, one minute for rebuttal. In this case, I find it particularly ironic that the National Marine Fisheries Service, which was so critical of the environmental impact statement and its narrow range of alternatives that tried to adjust the flows in the Eel River below the Potter Valley Project, committed the same mistake when it prepared the biological opinion here. And what NMFS did is it started with a single assumption, and that was that mimicking the historic flows of the dam below the project was the best way to protect the fishery. And what NMFS tried to do was determine what the unimpaired flows below the dam would be, but the dam still exists. So, and what they never did engage in was the analysis required by the Endangered Species Act, and that is whether the flows that they actually proposed under the reasonable and prudent alternative would not adversely impact both the survival and recovery of Eel River fisheries. And there are two cases that I think are particularly relevant to this case, both of which were decided after the briefing on this matter, and they're referred to in our 28-day letter to the court. The first is the Pacific Coast Federation of Fishermen case. And in that case, NMFS prepared a biological opinion for addressing the impacts of threatened coho salmon in that river system. And what NMFS did in that case was it found that the coho salmon needed a minimum flow of 1,000 cubic feet per second in the summer, yet it approved a reasonable and prudent alternative, what we call an RPA, that in dry years and critically dry years would allow significant reductions in that minimum flow. And what the court found is that the biological opinion was inadequate because it failed to articulate a rational connection between the facts found and the choices made. And it found the agency could not implicitly conclude that a species would not be jeopardized by the proposed action. Instead, it had to explain why, in that case, providing for flows below the minimum flows that they thought the fish needed would not avoid jeopardy to the species. Here, the failure of NMFS is even more serious because, first, the biological opinion here does not even specify a minimum flow requirement that's necessary to protect the fishery. What it tried to do was approximate what's called the natural hydrograph, the unimpaired flows. What do you want us to do? We want – How do we unwind – unring this bell or whatever? Right. I mean, it's certainly not the petition of petitioners – the position of petitioners that we want to return to the Article 38 flows, but we do want the matter to be remanded to the agency for a complete analysis of alternatives and an environmental impact statement, and for preparation of a biological opinion that goes through the analysis of determining what the impact of this is on the survival and recovery of the Eel River fisheries. Because we're dealing with a situation where the fish are in true severe decline. In 2001, four adult coho salmon returned to the fish counting station below the Potter Valley Project. In 2003, 75 adults steelhead. I think the biological opinion is that fish numbers go up and down, and the biologists have no idea why. I mean, fish counts go up and down in the Yukon, and there are no dams in it. Right, but here we're dealing with a situation where the NIMS has acknowledged that the fish is in serious decline. It's on the brink of extinction, and – But they don't know why. But – well, they actually have identified the factors that – To some extent, they identify a hot summer. And the flows that have resulted under the Potter Valley Project. But what they failed to do was to say, okay, well, what do the fish need then? What flows do they need? They said they were trying to approximate natural flows before the dam was But the problem is, we have a dam there, and we don't have the whole historic run of the river anymore, so that the fish have lost their access to their most essential habitat, where they would summer inland in the cooler waters in the upper reaches of the river. Do you agree with the irrigation districts that FERC's baseline is arbitrary and capricious? I don't think for us it's so much of a baseline issue, but their underlying assumption that what they were trying to get to was only the natural flows below the dam, without considering whether or not those flows alone, without access to the upper habitat, would protect the fishery. Because in the summer, the temperatures – the evidence in the record indicates the temperatures are too high for the fish, even under the natural flow condition in the lower reaches of the river. And what the fish used to do before the project was summer inland in the colder waters, but they don't have access to those waters. That sounds really bizarre. I mean, anadromous fish usually summer in the ocean, and then they swim up the stream in the fall, spawn and die. Well, they're two different things. One, some of the species come in in the spring. They spend the summer as adults in the river system. Some spawn in the late winter or spring, and then the small fish, the fry, stay in the system over the summer. And so, for example, the steelhead, the juvenile fish would be in the river system during the summer. And what the California Department of Fish and Game said, and what U.S. Forest Service said, is that in the summer, under historic conditions, natural flows, water temperatures are lethal to steelhead fry, the juvenile steelhead. So without the access to the upper reaches, just approximating the flow levels below the dam would not protect the fishery. And that's the issue that NIMS failed to really grapple with here. It didn't address the scientific information in the record. And even where they tried to approximate the natural hydrograph, the actual flows that are provided for under the RPA are far lower. They're a fraction of what would have occurred under natural flows. Well, it sounds like you want this to go back, that you want to go back to NIMS. I wasn't quite sure your answer to what you want us to do. You want first to rework everything, or do you want it to go back, send it back for a reevaluation? I think that, you know, what should happen is it should be remanded to FERC. The flows that are in place now should stay in place. But that NIMS should be required to re-evaluate, redo the biological opinion. And FERC should be required to redo its environmental impact statement to address the environmental issues associated with its action here. And unless the Court has any more questions. No, I think if you want to reserve some time, we'll give you a couple of minutes. Thank you, Mr. Attorney. May it please the Court, Lona Perry representing the respondent, Federal Energy Regulatory Commission. And I would like to share my time with Mr. Shelton, who's here representing the National Marine Fisheries Service, who authored the biological opinion at issue. The commission reasonably deferred to the National Marine Fisheries biological opinion, which was reasonably based and considered all of the scientific arguments that were challenged by petitioners and reached their own conclusions. And under the statute, the Endangered Species Act, it is set up so that the consulting agency is the expert agency and is supposed to make the final determination on questions of scientific questions regarding what is the best result for the fish. And here, with regard to the baseline issue, I think it's important to look at what it is exactly that the National Marine Fisheries Service considered when they were looking at the project and trying to determine how to avoid jeopardy to the fish. The environmental baseline as defined in the regulations includes the past and present impacts of all federal, state, or private actions or other human activities in the action area. And when the National Marine Fisheries Service was looking at the conditions, it looked at the past historical conditions, which resulted in jeopardy and decline. It looked at the current environmental conditions, which the fisheries service also found diminished or destroyed habitat. And then it looked at the proposed action of the commission, and it determined that principally or in large part because of the fact that it would still have the low flows, low fixed flows during the summertime, that the commission's proposed action would also result in continuing declines. And therefore, the fisheries service then looked to what would be necessary to avoid jeopardy. And at that point, they determined that what would avoid jeopardy is mimicking as close as possible the natural flows of the river, what would happen if the dam did not exist. And so ‑‑ I don't understand why that would comply with the reg. The reg says the environmental baseline includes the past and present impacts of all federal, state, or private actions. The dam is one of those actions. So it seems like the baseline has to include the dam. But then it can't be the stream as though the dam didn't exist. Well, this is the kind of problem that this court addressed, for example, in Alcoa in Note 6. The problem is that the fisheries service found that the current conditions, which are the Article 38 flows, would result in jeopardy, and also that the proposed action would result in jeopardy. And the point being that the point that the Alcoa court made is it can't be under the statute that you can have an existing condition that causes jeopardy and a proposed action that is only marginally better than the existing conditions but still causes jeopardy and satisfy the statute. Rather, what you have to look to is what is necessary to actually avoid jeopardy to the species. I can't make sense of that. I mean, we're looking at the Garden of Eden, and it can't be the Garden of Eden once the dam has been there for 100 years. But you can approximate the flows, and what the fisheries service concluded was under its recommended action, it would sufficiently approximate the flows. So massive. Also, if you're saying approximate the flows, treat that as the baseline, that means hypothetically remove the dam. But removing the dam hypothetically seems to conflict with including the dam, which is what the reg says. Doesn't it mean operate the dam so as to approximate the natural river flows? That's right, Your Honor, and that's what their recommended action contemplated was operation of the dam so that it comes as close as possible to what would have been the natural conditions that the salmon would have been existing under. So what they evolved to and what would help them to survive and preserve their habitat. And that was what the marine service was trying to approximate. So you're saying what that baseline means in practical terms is a dam but no reservoir. Whatever water is upstream from the dam goes over the dam and goes downstream from the dam. Nothing is locked up by the dam into a reservoir. No, Your Honor. What they did was they came up with a flow regime that as closely as possible approximated the natural conditions sufficiently so that the fish would survive and recover as opposed to further decline. You're giving me a formula, and I'm trying to make it concrete in my mind to see what that means. Well, to make it concrete, let me tell you, the problem with the Article 38 flows, which was carried forward into the flows under the proposed action, was in the fishery service's mind that it was fixed at five cubic feet per second during the summer. And it made the flows too low, the temperature too high, and it was bad for the salmonids, and it also increased the ability of pike minnow to prey on the salmon. And so what the fishery service did was they – gallons per minute, or a measure of how many gallons move from one place on the river to another place on the river over a period of time. When you say approximate the natural flow, I translated that into what it would be if you had no reservoir, just a dam, so whatever water is upstream goes downstream. But when I asked you about that, you said, no, that's not right. That's what I thought you meant when you answered Judge Trott's question, but evidently I did not understand what you meant. So put it in concrete terms. Okay. Well, so you're dealing with the five cubic feet per second flat rate. And what the Marine Fishery Service did was say that was what the existing flow pattern under Article 38 and that was under the proposed action, it would also be that fixed flow, five cubic feet per second during the summer. And what the Marine Fishery Service said was we want to have a variable flow that ranges from three cubic feet per second to 35 cubic feet per second, which depends on whether it's a wet year or a dry year. And so during years where you have more water available, you would get more flow so that it would be cooler, the habitat would be better, and the pike minnow predation would be reduced. That's what they mean by they were trying to come up with a flow pattern that would more closely approximate what would have happened naturally. But it translated into a very specific, it's not just releasing all the water that's impounded by the dam, but it's coming up with a flow pattern that is materially better than the one that's in place and the one that was proposed. For certain diversions that they were trying to make sure that they could do. Isn't that right? That's right, Your Honor. And they were just trying to make the flow pattern more, closer to what the natural flow pattern would have been, so as to improve the habitat and the ability of the species to survive. But isn't the problem here that there just isn't enough water to do all those things, save the salmon? Well, no, Your Honor. It was the conclusion of the Fishery Service, who was appointed by Congress as the expert agency here, that adopting their reasonable and prudent action would avoid jeopardy and promote the survival and recovery of the salmonids in the river. And they fully studied it. They issued a biological opinion. They looked at all the scientific dispute and evidence. And the commission was in a position to defer to that decision, because they are appointed by Congress as the expert agency on what is necessary to protect the salmon. It's somewhat distracting to put a label on what it was. It's easier, instead of saying unimpaired river flow, which creates all kinds of confusion because there's a dam there, just explain what it is. It's an attempt to regulate the water based on water conditions and the amount of water that's available. That's right, Your Honor. And to make the flows bigger and more variable to the extent that you can, given on whether it's a wet or dry year. Making it better to optimize salmon habitat is something different from baseline. Well, Your Honor, the baseline is defined as being the past and present impacts, which the Marine Service fully considered in issuing their opinion. And they found that historical conditions, current conditions, and proposed action would all result in jeopardy. And therefore, they had to come up with what they considered to be a means of avoiding jeopardy to the salmon. And the commission reasonably deferred to that decision. Their purpose was to make it better for the fish. That's right, Your Honor. I had thought that the baseline was where you start from to see if you're making it worse. Well, that's right, Your Honor. And they looked at current conditions, which had the 5 cubic feet per second flow, which was the Article 38 flows. And then they looked at the proposed action and said, it's the same flows. It's the 5 cubic feet per second flows. You're not making it any better with the proposed action. And that's how they reached the conclusion that the proposed action would, as the current flows did, result in jeopardy to the salmon. But then you have to make the next step, which is, okay, if the proposed action won't fix the problem, if it won't solve the jeopardy, what do we do? And that's the point at which they looked at creating a flow pattern that more resembled what the species had evolved to and had lived in under natural conditions. The alternative is that. It's the reasonable and prudent action that they imposed. And it's flexible depending on available water. That's right, Your Honor. It varies depending on whether it's a dry or so you can take advantage of greater water flows. The world works. That's right, Your Honor. If you have no further questions of me, I'll cede the remainder of my time to Mr. Shilton. May it please the Court. I am David Shilton representing the National Marine Fisheries Service. What happened here is that FERC came to National Marine Fisheries Service with a proposed agency action. That action was something called the Potter Valley Irrigation District Proposal. It was better than the Article 38 flows, but NMFS has to look at it and determine whether it would cause jeopardy or adverse modification. It found that it would. And at that point, NMFS's obligation is to come up with a reasonable and prudent alternative. Jeopardy to what? Jeopardy to the listed, the three listed species here. That's what you focus on is fish. Absolutely. Species. Right. That's NMFS's focus. And the reasonable and prudent alternative is a different way of operating that will avoid that jeopardy. Now, the baseline question here, I think that arose because the water interest here said, well, look, since the PVID proposal is better than the Article 38 flows that had been in place since 1983, that how could that cause jeopardy? In other words, they were saying the Article 38 flows have to be part of the baseline. We rejected that position because the Article 38 flows were expressly a temporary expedient. When this project was relicensed in 1983, they reserved the flow issue, because there just wasn't enough information at that time. So they put in Article 38 and 39. 38 had these temporary flows, and 39 said there will be a ten-year study, and after that the commission can determine what flows are really needed in order to benefit and maintain the fisheries. So to make Article 38 flows part of the baseline just ignores the license and the intent behind the license, which is that this would just be a temporary expedient. I have two questions about that. I guess one isn't so much a question. It's a difference in focus. NIF's duty is to preserve the habitat for the fish and to provide the necessary studies to do it. FERC's mission is different. FERC's mission is to balance various considerations, wildlife, recreation, and other things in the production of electricity sufficient for the people. And your baseline assumes it's still hard for me to make sense of exactly what it is concretely. It looks to me as though it assumes the non-existence of a 100-year-old dam, because that would be better for the fish. And I can't understand how you reconcile that with the language of the reg, which says you have to include the past and present impact of federal, state, and private actions. NIF recognizes that the dams are there and considers the dams themselves as part of the baseline. The key to determining what is and is not part of the baseline, I think, is what's the discretion that's available to the action agency. When you say it considers the dam as part of the baseline, how can that be if the baseline is a flow of water that would be there without the dam? Well, because you could theoretically run the project as a run-of-the-river project, and all the water coming into the top would come out at the bottom with the dam still in place. But NIF has never recommended anything like that as a reasonable and prudent alternative. It simply used that run-of-the-river type of flow as an indication of what these salmon had grown up and evolved under to tell NIF scientifically, you know, what are the best possible conditions. And that's just a scientific method that NIF uses to look at what the natural conditions of the river are. Would there be alternatives to that that would be that would take into account the existence of the dam operating at some level that would serve the same purpose? There could be. It was open to NIFs to have a reasonable and prudent alternative that would have. No, no, I'm talking about your baseline. Well, the baseline regulation is very general. It basically just says, look, the definition of effects of an action are the effects of what is proposed when added to the baseline. And so it's really saying you've got to consider the whole picture. It's an evaluative type of regulation, which just wants to make sure that the NIF looks at the entire picture. But it's not the sort of regulatory regulation which has a very precise notion. It's not a term of art. Shouldn't it be read just to mean you start from where you are, not from the Garden of Eden? You start from what you have discretion to do in the particular proceeding. That's not what the words are. It says that it includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area. To me, that means you start where you are, not in the Garden of Eden. Right. And I'm not contending that you start in the Garden of Eden. You do have to begin with those things that you don't have the legal ability to change in this proceeding, and that is the dams. I mean, NIFs did not consider that it was possible to decommission the dams, and that's why the other side is unhappy with us. NIFs found, though, that the Article 38 flows that had been in place since 1983, that those weren't part of a baseline. They weren't a benchmark. Baseline as a practical matter. I mean, if you do see a river in its natural state, totally undeveloped, no people, no cities, no dams, no nothing, there are lots of rivers like that. And they change all the time. They move around. They're in different places from one year to the next, totally different flows. You really can't predict them. They're too complex. They are very complex. And I think that the baseline issue shouldn't be blown out of proportion here. I think really the only baseline issue is whether the Article 38 flows have to be considered as part of the baseline and basically put to one side. And our position on that is that the whole reason for the Article 38 flows was that it would be temporary and that FERC would have discretion to choose another flow regime when the study was finished. Now, on the other side, the environmental groups are saying that NIMS should have considered a reasonable and prudent alternative that would have decommissioned the dams or added fishways. And there again you have to go to the question of what does FERC have discretion to do in this proceeding. And we thought, we believe that FERC correctly defined its own discretion here as being over flows because this was not a relicensing. This was an amendment of a license. And the only issue the amendment really kept open was the flow issue. So that's why the reasonable and prudent alternatives that NIMS came up with just have to do with flows and not fish ladders. That's the reason for that. And in coming up with the flows, I think NIMS grappled with all of the issues. It grappled with the problem of high summer temperatures by finding that FERC needed to change somewhat the regime so that, at least in wet years, there would be more water that's passed through during the summer because there are steelhead fry that rear in the area below the dam and need the additional flows to keep the temperatures down. It grappled with all of the other issues in its lengthy biological opinion. Now, I think it's also important to point out what issues have been preserved here for this Court's review. The issues of the baseline and the issue of whether NIMS should have considered the fishways, those were preserved by the requests for rehearing that were made by each side. No problem there. But that request for rehearing did not raise a couple of the issues that the environmental petitioners are now putting forward, which were the issues of the critical habitat, the consideration of critical habitat and whether recovery was sufficiently considered, and also whether in determining jeopardy and whether the reasonable and prudent alternatives would avoid jeopardy, NIMS was under a duty to have a specific criteria. Those issues were not preserved in the requests for rehearing, and that's a jurisdictional requirement in order to get review in this Court. The ‑‑ I think I've covered the issues that have been raised today, but if the Court has any particular questions for NIMS, I'd be happy to answer them. Thank you very much. Your Honors, I appreciate the Court's attention this late in the morning. This means a lot to a lot of people. Let me briefly reply. And I think the Court has learned a lot from hearing from the Respondents. The only way NIMS can justify its conclusions is what we've just heard. Article 38 is a temporary expedient. In the Covello community case, this Court decided that Article 38 and the entire license was a final agency action. Now, here are ‑‑ Why do you have a final agency action to have a temporary process? You have a final agency action that authorizes the commission to reconsider the flow regime it established. But once that agency action is final, that fixes the baseline and defines any future Federal action to change the final action. We can ‑‑ this has been a wonderful discussion this morning, as all of us perhaps try to think of. I don't follow what you just said at all. Yes, Your Honor. The language of 38 and 39. 38 installs ‑‑ 38 installs a flow regime. And the baseline is not just the hardware, if I can also anticipate Judge Kleinfeld's question. The baseline is not just the hardware. In the field of water resources, the baseline is also the operational rule curve. And the best way to ‑‑ for the Court, I think, to see that, I can just really recite some record citations. Burke's explanation of why it thought the baseline was incorrectly drawn by NIMPS, pages 2401, 2402. Pages 2153. In 1983, the final order said the settlement permits complete review of the fishery flows after 10 years and the opportunity to correct any deficiencies at that time. That's correct, sir. But it does not require that they be changed. And Article 39 can authorize a change. But to return to the point we tried to make earlier, the no-action alternative is to leave Article 38 undisturbed. And that is no Federal action. That is no jeopardy. But regardless of what we think it is, let's look at what FERC said it is. We heard this morning from FERC's attorney that FERC did not ‑‑ that FERC determined that NIMPS had it right. But that's not what FERC's order says. Let me read from paragraph 101 on page 2418. FERC, we have concluded that the PVID alternative provides sufficient assurance of benefits to the threatened salmonids and less risk to other water users than the regime provided by the biologic opinion. And here is the clincher. And would not jeopardize any of the listed salmonids. We're not the experts, so we defer to the experts. And the expert, Your Honor, is FERC. Okay. The expert in defining what its project is, relying on this Court's decision in Covello, is FERC. And FERC is the one that is charged by the statute to make that determination. Consulting with NIMPS, but when NIMPS misreads things, FERC cannot go along. The final citation I would leave with Your Honors to explain this whole baseline thing is page 2365. That is one page of a letter written by the my client, the Mendocino County Water and Power Commission. Yes. Thank you. Thank you, Your Honor. Very briefly. Very briefly. We've heard FERC's lawyer and NIMPS lawyers say they lacked authority to consider alternatives such as decommissioning and fishways. That's contrary to the record. Article 39 makes clear that the commission reserves authority to make changes in release schedules. Wait. Decommissioning the what? Excuse me. Decommissioning and fishways as the two alternatives. Oh, and. Okay. And that's very important because only by allowing the salmon to access the hundred miles of prime spawning and rearing habitat upstream of Scott Dam can you give the salmon a chance. Decommissioning the dam. Excuse me. Would be in a stepwise fashion, Your Honor. This is a 9.4 megawatt dam. It's virtually useless to generate power. We need it to save the fish. It's a $50 million fishing industry at stake here. Article 39 reserves FERC's authority to adjust flow release schedules or project structures and operations. Article 46 reserves the commission's authority to require changes in the project works or operations that may be necessary to protect and enhance those resources and values. If we came to a condemnation process and we're only saying look at the potential pluses and minuses, 16 U.S.C. Section 807A reserves that authority in the commission. The FEIS in this case defined this project to include potential structural changes. At FERC 928A1-1, the EIS said this project's purpose was to, quote, modify existing project structures and or operations to benefit anadromous salmon and steelhead populations. NMFS itself in repeated submissions to FERC stated, with all the proposals currently being considered, implementation would likely adversely affect listed salmon of species. Only decommissioning of the project would eliminate adverse effects. That's at FERC 871-2. So it is clear the science in this case said there's no issue. If you decommission this dam, you will save the salmon. Anything beyond that, it's a risk to the fish. Thank you, Your Honor. Thank you. The case just argued is submitted for decision. That concludes the Court's calendar for this morning, and the Court stands adjourned.
judges: Schroeder, Trott, Kleinfeld